We will hear argument this morning in Case 24-935, Flowers Foods v. Brock. Ms. Lovett. Thank you, Mr. Chief Justice, and may it please the Court. In Bissonnette v. Saxon, this Court held that a Section 1 transportation worker must be actively engaged in transportation of goods across borders. The class of workers must be directly and actively performing cross-border transportation work. Brock picks up goods from a warehouse in Colorado and delivers them to retail outlets in Colorado. When he takes the goods, they've crossed their last border and they have been unloaded from the interstate vehicle carrying them. Mr. Brock performs no work in cross-border transportation and is not exempt under Section 1. This result is faithful to Section 1's text and to this Court's precedent because it focuses the inquiry on the workers' connectivity to cross-border transportation work. Brock's rule departs from text and precedent by focusing on the workers' relationship to a good and the goods' relationship to interstate commerce. And Brock's approach would lead to unlimited chaos. It is a world where everything is dispositive and everything is relevant and nothing is dispositive. We know that because that's what's happening in the First, Ninth, and Tenth Circuits today, all of which follow Brock's approach. And Brock's approach sweeps in too many workers into Section 1. Today, in the Ninth Circuit, workers who deliver the New York Times in the state of California have been deemed Section 1-exempt workers by the Ninth Circuit because the New York Under that logic, the store clerk who unpacks boxes from another state and transports them to the shelf should also be exempt. But in 1925, no one viewed the store clerk or the paperboy as a cross-border transportation worker. The Court should pick up where Bissonnette left off and reaffirm that Section 1 does not have limitless terms. I welcome the Court's questions. Mr. Lovett, what is the final destination for the product in this case? I'm not sure. I think that's a question better posed to our opponents because one could argue that the final destination is the shelves. One could argue it's the warehouse. Well, I mean, it's your product. So if it's Flowers' product, then what should be the final destination? Again, I think that is a question that can be answered on many levels. Under the Federal Motor Carriers Act, the destination is to the ultimate retailer. Under the Commerce Clause, it's, you know, I'm not sure because the final destination cases don't give you a framework by which to judge the final destination. I thought at the search stage you told us that you conceded that Brock's Flowers last mile driver who delivers Flowers' goods that have traveled across state lines from local warehouses to local retailers. Now, whether District Court and the Circuit were right in making that finding is irrelevant. You gave us a concession. So that concession answers the question. The contract was between Flowers and its local retailers. So I don't know why you're saying it depends. The concession told us. Because it begs the question, last mile driver of what? Of the good or of the final mile of cross-border transportation? Well, counsel, it's the goods. So the goods are traveling in interstate commerce. Now the question is, is this driver helping that interstate process? Is he involved? Is he involved from a commerce clause? Yes. From a commerce clause perspective, yes. Otherwise, we wouldn't fall within Section 2 of the FAA. We're not pushing back on the fact that Mr. Brock is engaged in interstate commerce from a commerce clause perspective. But this Court for twice in four years has held that Section 1 requires more than a commerce clause analysis. It requires an analysis of the actual work the worker is performing. And the worker is performing the work of a local delivery here, not any cross-border transportation. And on this, I think Sakson is quite informative on what is... The problem is that we have too many cases that say you don't have to be the person who actually does the transport. The baggage carrier that's unloading from an airplane hasn't transported the goods across interstate lines. We have a slew of cases that talk about people who don't cross state lines. So it's not that. That's not our position. We fully embrace Sakson. In our view, Sakson was asking the question, what is cross-border transportation? And it looked through to cases in the bill of lading context and said transportation ends when a good is unloaded. So we read... I think it's a fair extension of Sakson to say... When goods are unloaded, and that's what Mr. Brock does as the last mile driver for flowers, which is a concession you made. But he's unloading an intrastate journey. And the question is, when does the interstate journey end, and it ends at the warehouse when the goods are unloaded by someone other than Mr. Brock? I understood, and maybe it's very oversimplistic. I understood the case involved with the dispute between whether we look to the goods or whether we look to, essentially, the vehicle. Is that a fair oversimplification? I think it's fair, but a slight oversimplification. We would say that you look to the work of cross-border transportation. And the direct and active engagement that Sakson and BCNET require, it's hard to imagine a situation where you wouldn't have some interaction with the vehicle to be directly and actively engaged. I mean, Ms. Sakson had an interaction with the vehicle, but it's not our position. I want to just be clear for the record that you have to be crossing the border. That's been a characterization of our position that's inaccurate. Our position is you have to be performing the work of cross-border transportation. And Sakson says that begins at the loading process, and it ends at the unloading process. And the cross-border movement in between is irrelevant transportation. Mr. Brock loads for an intrastate journey and unloads on an intrastate journey and never performs any actual transportation work that involves cross-border performance. It's really only, I think, if you ignore what is happening to the goods. And the thing that's a little puzzling to me about your analysis is that you set it up in a way that would end up having different workers along the journey of a particular good being characterized differently. And I don't understand why Congress would do that or how that even makes sense. So, I mean, take flowers, right? Suppose you have a worker who drives the bread from Flowers Bakery in Kansas to the border between Kansas and Colorado. But that worker doesn't cross state lines. And then you have a second worker who unloads the bread from the first worker's truck inside, still inside Kansas, puts it on his own truck, drives it across the border, and unloads the And you have a third worker, like Brock, who picks up the bread in Colorado and delivers it to a store in Colorado. I think your analysis has only the second worker covered by Section 1 exemption, and I'm not sure I understand why that would be. I think that's an accurate characterization. It's because crossing the border matters. It matters from a legal perspective, and it's expressed in the residual clause. But doesn't it only matter because the goods are crossing the border? The person is not crossing the border, so what relevance is it to your analysis that you have a particular worker in the middle of the goods journey who himself crosses the border or who touches a vehicle that crosses the border? It would seem to me that the only real thing that makes sense about characterizing any of these people as interstate transportation workers is that they are working with respect to goods that are making this interstate journey. Because this court, again, has held twice in four years that you're looking at the work that's performed, and the worker's performance... Right, but it's the work that is performed relative to goods that are crossing the border, I think, as opposed to your theory, which is the work that is performed in a particular leg of the goods journey that has crossed somehow. There's nothing textually in Section 1 that's compelling to focus on the good. But to the contrary, Section 1 is sort of dripping with workers' work and vehicles. The enumerated classes are defined by the relationship between workers and vehicles. By definition, seamen are crew on a vessel. So Ms. Saxon is not herself on a vehicle, moving a vehicle, going across the border, but you say she counts under your view because why? She has loaded or unloaded cargo off of a vehicle that crossed the border? Because Saxon held that the cross-border transportation begins at loading and ends at unloading. Yeah, but it's loading what? It's loading goods. So I don't know how you can isolate the goods and take them out of it. She's not going across the border. The vehicle that she's touching is not going across the border at the time she's touching it. What causes the interstateness of that scenario is that goods, she's picking up and touching goods that have crossed. No, but the court held, with all due respect, I would ask Saxon to say that the interconnection is not just the loading of the goods, it's loading the goods on a vehicle that's on an interstate journey. That second, the court would not have needed to labor as much as it did over the fact that the vehicle is on an interstate journey and labor over the fact that you have to be crossing the border if the test wasn't easy as a goods test. Ms. Lovett, there does seem to be a lot of room for dispute about who owned the goods and who ordered from whom and lots of facts here. We have some excellent diagrams in the Tenth Circuit opinion that are helpful to me at least, but I wonder whether we need to really get into any of that because as I understand it, you're advocating for a bright line rule. You think there needs to be clarity here. The bright line rule I think you're asking us to adopt is that a delivery driver is in interstate commerce unless he does not cross state borders and he doesn't interact with vehicles that cross state borders, right? Close. I think we would say you bookend the transportation with loading and unloading. That's the result. But I'm not really interested in any of that. I'm saying I don't see that in the QP. Okay, I don't see goods. I don't see anything like that in the QP and unloading and whatever. I see, but do not transport the goods across borders nor, that means, interact with vehicles across borders. That's the question you asked us to decide, right? Correct. Should we adopt a bright line rule that delivery drivers are in interstate commerce unless they do both of those things? I would say unless they do either of those things. Okay, either. Unless they're loading or unloading across borders. Either interacting with vehicles or crossing the borders themselves. Yes. And we can answer that question yes or no and be done with this case. Yes, and I think Section 1 is demanding as a threshold requirement. It's a bright line rule. It's a bright line rule. You're not asking us to get into whether Brock takes title to the goods, whether the grocery stores order products from him or from you, how long the goods stay in a warehouse in Colorado after arriving from out of state, whether the goods are transformed or repackaged, whether the contract here with a corporation is covered by the FAA, or how much control Flowers has over Brock. None of those questions we need to get into.  And I think that's what's steering the Tenth Circuit in the wrong direction because none of those facts have anything to do with the workers' work. Well, whether they do or don't, we don't need to get into them. Exactly. I mean, I think they're another ground on which we win, but that's not what we're arguing here. The problem with that— Suppose a company structures its delivery drivers so that Driver 1 drives 10 hours on an intrastate leg, then Driver 2 drives one minute across an interstate border, then Driver 3 completes the journey with another 10-hour intrastate drive. Each driver uses a different vehicle. Is Driver 2 the only person covered by the exemption? Can I ask a clarifying question? As I read Saxon, the cross-border transportation ends with unloading. So if there's no unloading, that's one cross-border transportation. But when you added different vehicles, it makes me question whether you have an unloading process, which would debarkate a new leg of transportation. Yeah, there's an unloading, obviously. The goods have to get from one truck to another. But under that situation, only Driver 2 would be covered by the exemption. Yes, because the bookends are loading and unloading. And Saxon says that the transportation continues until the unloading process. And looking through the cases that Saxon's citing, those cases are about when does transportation end, because transportation needs to end at some point. And they're holding the cross-border transportation into the unloading process, which makes sense. If you've ever been stuck on the subway and you can't get out, you really feel like your transportation hasn't ended until the door is open. And those cases are saying there is a clear demarcation in transportation. Loading, unloading, and the movement in between. And if the movement in between is cross-border or interstate, it falls within the rule. And it may sound simple, but this is the kind of clarity that Section 1 really needs to have, because it is a threshold requirement. It's clear, but where does it come from? It comes from a combination of a justum, which tells us that the workers in the residual clause are transportation workers. And then it also comes from this court's interpretation. Where does it come from in the language of the statute? Engaged in. This court interpreted engaged in, in both Saxon and Bissonnette, as being directly and actively employed. And then adds to it the interstate component, which requires interstate transportation, because you're talking about transportation workers. It's all three of those principles coming together that say you have to be a transportation worker that's actively and directly involved in cross-border transportation. And then Saxon asked the question, well, what is cross-border transportation? Is it just the movement of the vehicle? And the court held no, actually, that process continues through loading and unloading. I'm sorry. This, Justice Alito, is asking you a lot of questions. I'm trying to deal with our cases. And we have a bunch of them at the time of the FAA.  Which said, let's start with Philadelphia and Redding versus Hancock. This court held that a first mile trainman, whose duties involved transporting coal from a mine to a storage yard solely within Philadelphia, and that coal was then transferred by a different crew to another train that was going in interstate commerce. The court explained that that first mile driver, not the last mile driver, that had done everything in Philadelphia, and the goods were unloaded and reshipped somewhere else, the court said that shipment was but a step in the transportation of the coal to real and ultimate destinations in another state. And so that trainman, that first trainman, was involved in interstate commerce. You want to distinguish that case.  Here, the same thing happened. You want to distinguish all the cases with first mile drivers, second mile drivers. You want to create a new test. And I still want to come to where in the language of the FAA that uses the word engaged, which is the same word we used in Saxton, that defined all of these people as engaged in interstate commerce. Two answers to your question. The first is we would disagree with the characterization of Hancock, because in Hancock, that was a rail car, a single rail car that started at the mines and went interstate. It was never unloaded. The corollary here to Hancock would be if Mr. Brock got into the truck and drove the final ten miles to the warehouse. That's the corollary to Hancock. That's not what Mr. Brock is doing. And again, FILA is focused on what exactly are the instrumentalities of the rail carrier doing. The instrumentality, the rail car was crossing state lines. But it's not the issue of the rail car. And you're saying don't look at the goods, look at the worker. And the worker wasn't doing any of that. We're saying FILA is an asset. These are FILA cases that have a very different type of structure. But I don't understand. Just try to distinguish them, but they're what we relied on in Saxton. You did rely on it. You actually relied on two cases in Saxton, which were Birch and Short. The Birch case is a FILA case, which said that transportation continues until you're unloaded. And Short was a bill of lading case. Unloading at the point of destination. Unloading of the vehicle. Unloading of the vehicle. And because they're defining what transportation is. Transportation can have an end that's different from the goods end. I'm sorry. I may have interrupted Judge Alito. I'll just ask one or two questions. I've asked all my questions. How do you handle first mile drivers? Is your analysis different than those? No, there's a mirror image of Brock. The first mile driver, and to clarify terms because I don't do a lot of loading of what first and last mile mean, if the driver were to pick up the goods at the bakery and take them to a local warehouse and unload them, that's to me the first mile driver. That's the mirror image of Brock. And they would not be exempt. Thank you. Let me just go back to I think the point that Justice Alito was making with his hypothetical is like whether or not your test is clear, it has a real arbitrariness to it. Practically speaking, what you want to be thinking about here, it would seem to me, is there's a manufacturer of bread. And the manufacturer of bread needs to get it to all the local markets that sell bread. And so when we think of what's in interstate commerce, what we're thinking of is the trip by which the manufacturer might be one leg or three legs or eight legs. It might, different legs might cross different state boundaries or not. But what the manufacturer needs to do is to get the bread from the factory to the supermarket. And if that's in interstate commerce, if the goods, the cargo, the bread is crossing state lines, then everybody who's involved in making the goods cross those state lines ought to Did you take the first mile? Did your 10-hour shift cross the state line or didn't it or whatnot? To answer your question, I think the textual hook here is engaged in. And this court held in Saxon and in Bissonnette that engaged in requires direct and active employment in cross-border transportation, the performance of cross-border transportation, not in interstate commerce. Well, they're all, regardless of which leg that they're exactly on, they're all directly engaged in the interstate shipment of your bread. That's not the, respectfully as we read Saxon and Bissonnette, the text is what is the class of workers doing? What work are they performing? And Bissonnette says you shouldn't be looking at what Flowers is doing. That was the hard lesson we learned from Bissonnette is it doesn't matter that we're in the industry of selling bread cross-borders, that the court shouldn't be looking at that. That was the clear takeaway from Bissonnette. It should be looking at what is this class of workers doing? What's their task? What's their job? What are they performing? They're all driving the trucks that get your bread from the factory to the supermarket. That's what all of them are doing. And when those trucks, when that trip is an interstate trip, they're all doing the same thing, regardless of the happenstance of whether one or the other of them is crossing a state line. And that's where we respectfully disagree because we think crossing the state line matters. It's in the text of Section 1 that it has to be interstate. And so if you're looking at whether the class of workers is actually performing cross-border transportation, they need to be crossing the border. And crossing the border is really significant. Well, the Saxon workers were not crossing the border, so we've given that one up already. But they were involved in shipments of goods that did cross borders, and that's what mattered. Well, again, as I read Saxon, it's saying that cross-border transportation is a definable thing. It starts with loading and ends with unloading. And if you're loading on a vehicle that's traveling interstate, that is part and parcel of the journey across the border because you can't journey across the border until the goods loaded. You can't end the journey until the goods off. And I think that's... Can I ask you a question about that to just test your hypothetical? What if the goods were always in state, but the vehicle somehow crossed the border? Is that not going to... You say loading and unloading, and I guess you're assuming that it's loaded in another state and unloaded in this one? Or could it be that you are a worker who is working with vehicles that have themselves crossed the border, regardless of where the loading and unloading happens? So this court has always talked about moving goods, but I think in your example, if your class of workers are interstate truck drivers, and this is actually akin to the Zachary case where you have an empty truck and you're driving the truck across state lines to pick something up, I would think that... No, not across state lines. Not across... Ms. Saxon didn't go across state lines, so let's hold the worker constant. They're not moving. You say what makes Saxon count is not that the goods that she was loading and unloading had been across state lines. It was that the airplane that she was loading from had been across state lines. So I'm testing this hypothetical, or this theory, by isolating the goods, having the goods remain in state, and just having workers who are working with vehicles that have crossed state lines. In that situation, are the workers interstate workers from your perspective? I'm going to have to ask a clarifying question, because I'm not understanding what the workers' relationship is with the vehicle. Are they loading it? Yeah, they're loading it, but they're loading it for goods that were loaded still in the state, but the vehicle has crossed state lines. The vehicle themselves, for some reason, in my hypothetical, the vehicle is moving across state lines, but the goods have always remained in the state. So the worker is working with the kind of vehicle that you say counts, and the goods are staying put in the same state. Is that person an interstate, in a class of workers that is operating interstate, in your view? So if a class of workers is loading a vehicle that is not in interstate... No, the vehicle is an interstate. The vehicle comes in from New York, and I'm in New Jersey, and I'm the worker, and I'm loading this vehicle in New Jersey with goods that started in New Jersey and that are going to end in New Jersey, but the vehicle came in in the morning from New York. The vehicle has been in interstate commerce or interstate traffic for your purposes. Is that worker an interstate class of worker? Under Saxon, the transportation, that leg of transportation begins with loading, and so you wouldn't look at where the vehicle... You don't look at the vehicle at that point. The question is when does cross-border transportation begin and end, and Saxon says it begins with loading and it continues through to the unloading. So that leg, you would start the analysis at the loading and say, now where is this vehicle going? Without regard to where the vehicle came from. Because Saxon draws a clear line at loading. Thank you. Thank you, counsel. Justice Thomas? Justice Alito? Justice Homayore? Justice Gorsuch? Quick question. Why didn't you argue the title, that the title changed once you delivered it to Brock in Colorado, you're done? That would have been an interesting argument. We argued that at the lower court. I know you lost that one below, but it hasn't stopped you from... No circuits. It would be an interesting question. That's a question for another day. So it's a question for another day. If you win, there's no need to resolve it, but if you should lose, it's a question for another day. I think if we prevail on this rule, you're solving 999 cases. I understand that. It could happen. It could happen. If you should lose, that's a question for another day. And then maybe you'll see me here again in another year. I'll look forward to it. Justice Kavanaugh? Justice Barrett? So that's one question that might be reserved. Let's imagine a hypothetical world that you don't want to be in, in which you do lose. Things that you would want to reserve would be this title question? Correct. What else? Contract of employment. And that's where the next circuit split is developing is, you know, when do you have a contract of employment as opposed to a third-party service provider? Okay. And if I envision the movement, the interstate movement of goods in a relay race way, this goes to some of the hypotheticals Justices Alito and Kagan were asking you, you know, where the goods pass from one to the other so it doesn't really matter, you know, if the mile-three driver was solely interstate or not. What, and again, we're imagining a world in which that is viewed as a continuous journey. What would, in your view, be an interrupting point? Because there being, it can't just be, in that world, it can't just be loading and unloading because they're loading and unloading into trucks. Would it be when they're off wheels and so then they're put into a warehouse? I mean, what would be the danger spots, in your view, in that? I think Saxon draws a bright line at unloading. Saxon says that the transportation process continues until unloading. So I think once the goods are off the vehicle... But I'm imagining a world in which you lose that point because it goes right to another vehicle. In Saxon, they were unloaded and then, you know, maybe they went on to the little cart in the airport that moves them to the line. But, I mean, they had reached their destination. In the hypothetical Justices Kagan and Alito were giving you in that series of hypotheticals, they were being loaded from one truck to another truck. So maybe there was always movement. It was just like a relay race where it went from one to another. But it wasn't unloaded at a destination, right? In those hypotheticals. In those hypotheticals, in our view, it doesn't matter if it's at its destination or not because you're not looking at the goods, you're looking at the worker. So if it's unloaded, but if it's a true relay, if it's like the Hancock case and you have Mr. Brock jumping into the truck or, you know, the true analogy to Hancock is you take the trailer and you put it on a new tractor. You know, that is not the taking the goods off of the vehicle. It's the relay. And the relay counts until the goods actually come off of the vehicle. Okay. Thank you. Ms. Jackson, anything further? Can I just clarify that the title, contract of employment, all those issues are just factors that help us to determine whether this person is a last-mile driver. And so the reason why they weren't raised or argued here is because you assumed that, you conceded that at the beginning for the purpose of this case. Well, for the purposes of the case. For the purposes of the case. We were just to focus on assuming he's a last-mile driver, what is the answer? And those questions about title and contract and whatnot that the Tenth Circuit actually grappled with are about whether he qualifies as a last-mile driver. Right? Well, I mean, not to push back on the term last-mile driver, but I think that begs the question of last mile of what, you know, our argument is he's not the last-mile driver of the cross-border transportation. But to your point, I think that, you know, this Court could, if it wanted to, look at those factors, but that's definitely... But it doesn't answer the question before us today. It doesn't answer the question before us. It doesn't resolve the split. Thank you. Thank you, Counsel. Who's that? Mr. Chief Justice, and may it please the Court. As this Court recognized in Saxon, interstate commerce is not merely the act of crossing a state line. It is trade and traffic between the people of different states. That's why interstate commerce has never been understood to end the moment that freight crosses the border. It ends when the goods reach their final destination. And workers who transport goods that are traveling in interstate commerce are, by definition, engaged in that commerce, regardless of whether they personally cross state lines or interact with a vehicle that does. These principles were well-established in 1925 when Congress exempted any class of workers engaged in interstate commerce. And last-mile drivers transport goods on the last leg of an interstate journey. Under the FAA's plain text, these last-mile drivers are exempt. Now, Flowers asked this Court to add an additional requirement that workers interact with a border crossing vehicle. But as I just heard, Flowers can't point to a single case in any context from any time period where a court has ever adopted that requirement. So not only is this interpretation atextual, it would require courts to develop a whole new jurisprudence about what it means to interact with a vehicle. So we just heard that if the trailer goes from one truck to another, that counts. I'm not sure whether the trailer is a vehicle or not, but apparently it is. What if the goods were taken directly off the first truck and handed to Mr. Brock to put on his truck? Would that count? Highway gas station attendants trust cross-border vehicles all the time. Are they exempt? And none of this would eliminate the need to determine where an interstate journey begins and ends, because you can't know if a vehicle is in interstate commerce without knowing where that journey begins and ends. But on Flowers' view, history and precedent can't help answer that question, because the words of the FAA mean something different than they've ever meant in any other context at any other time. So this requirement of interaction with a vehicle doesn't make the worker exemption easier to apply. It just makes it more arbitrary. I welcome the Court's questions. In Saxon, we referred to activities within the flow of interstate commerce, and that at some point begins and it ends. In this case, what would be the final destination of the bread? And the final destination in this case is the retail stores that are Flowers' customers, so the Walmart, the Sam's Club. And the reason for that is because in 1925, it was really clear that what the final destination was is where the parties to the commerce intended the journey to end. And I realize the Tenth Circuit's decision is written in a complicated way, but I think this case is actually a straightforward case, as most cases will be. Flowers repeatedly has admitted and described what's going on here as that the destination are its retail stores. So if you look at, for example, the Court of Appeals Joint Appendix at 272, Flowers says the destination of these goods is the retail stores, and the distribution depots are just a temporary pause. And if you look at the contract, Mr. Brock would be fired if he didn't bring the goods to the retail store. Well, but I mean, look, the other way, why isn't the ultimate destination, the person eats the bread, right? And without that, there's no reason. And it's just, I don't know how you skip over the step from the warehouse to the driver, but not skip over, particularly skip over the step from the store to the consumer. Particularly now, since a lot of people don't even go to the store, they use one of these services that will get the bread from the local warehouse. Sure. So this question came up in 1925. I didn't remember that. And the way courts answered that, how do you figure out what the final destination of one And you look at the intention of the shipper and the parties to the commerce. So when Flowers, as far as the shipper here, when Flowers shipped its goods, the journey was to the retail store. The commerce of a local retail store sending by Instacart or something groceries to a local consumer, there are different parties to that commerce. It's a separate journey. Well, Ms. Bennett, though, I mean, do we need to get into any of that? I mean, one might argue that in some cases, at least, the manufacturer really doesn't care what happens once it passes title to a wholesaler, right? I mean, it delivers it to Brock's Warehouse. Let's just suppose, hypothetically, title passed. It doesn't care whether that bread gets to a store or a consumer or spoils. It's got its money. It's done. One can see that argument, but that's not in this case. So why are we fussing over it? I think that's right, and I think the question you just asked is exactly the question that was asked in 1925, which is, when this good was shipped, where was the end of that journey? And if the shipper doesn't care, if it goes beyond a particular point, that's the end of the journey. That's the end of the journey, right. So that could be the answer in that, if you prevail, that's an argument that would be along with, can a corporation be a transportation worker, along with a whole bunch of other things. All we need to decide in this case is Ms. Lovett's proposed bright line rule, that you're in interstate commerce unless you drive across state lines or, and I take the or, interact with vehicles that do. And we just need to answer that question and be done in this case. That's exactly right, Your Honor. There's lots of things that followers conceded for purposes of this particular question. And we will get to see you back here again and again and again, right? You would. Counsel, can I ask you a question? How would you define the class of workers here? I mean, last mile driver seems fairly imprecise, because you could be a last mile driver. For this purpose, you could be a last mile driver of a fully interstate journey. You could be a, I mean, there are many different ways in which that term could be used. So how would you define the class of workers here that's engaged in interstate commerce? I would define it as workers who perform the last leg of an interstate journey. And that's similar to the way. Why do you want us to define it that way? Because it could be the third leg of an interstate journey. If we're answering the question that Ms. Lovett proposed, it could be driving the third leg of an interstate journey, but only an intrastate portion of it. So why do we have to use this word last mile drivers at all? Is it truckers? Who is the class here to whom your client, to which your client belongs? Sure. You don't have to. I would have no objection to drivers who drive an intrastate leg of an interstate journey. I think that also works. I think potentially the class of truck drivers is analogous to seamen and railroad employees with the caveat of Saxon that because truck drivers are doing the actual transportation work, we're not pulling in any other employees, although that's not the question presented here. The reason we have picked last mile drivers, two reasons, in the cert petition and the reply, that is the class of workers that Flower said we were talking about. Sure. Let me take you back to the... Sure. Can I... Sure, sure. But is that a term... I mean, my concern here is do we spin off the jurisprudence of what is a last mile driver and does that apply to different contexts? So just to wrap this up, you're not led to this term. You don't think that this term particularly matters. The class could be defined differently. No. And I think you could... You see in the real... What we're getting at is a class of workers that exist in the real world. It's well-established. It's not gerrymandered for this case, like seamen and railroad employees. And in 1925 and now, in the real world, you can advertise for essentially an intrastate leg of an interstate journey. They're often called last mile drivers, regardless of what leg they're in, but no objection to defining it that way. Let me take you back to the Chief Justice's question. So suppose a grocery item is produced in one state. It is shipped across state lines to a grocery store in another state, and then an Uber Eats driver picks up goods that have been ordered by a customer, gets in a vehicle, drives to that person's house, delivers the goods. Is that person within the exemption? No. And here's why. Why? He's the last minute driver. He's the last mile driver. For the same reason that he wouldn't have been in 1925. And what we're looking at is the intent of the parties to the commerce to see where the journey begins and ends. So here, flowers shift its goods to retail stores, and the parties to that commerce are flowers in the retail stores. The parties to commerce of an Uber Eats driver is a local consumer, a local store, and a local driver. And that case was clear in 1925. You can look at the Weigel versus Curtis brothers. I find that hard to understand. The person who, the company that produces the goods out of state, intends to be paid for those goods and is not going to be paid for those goods unless they're sold. The intent of that company is not just to have them shipped to a grocery store and sit there. So my understanding is that the sale is from flowers to the grocery store, and so flowers doesn't care whether the grocery store sells the goods or not. Flowers has completed its sale when it's purchased and arrives at the grocery store. And what the grocery store is buying is the goods plus transportation. There is a separate sale between a retail store and a local consumer. And again, that line was clear in 1925. It's the Weigel case. And lower courts are unanimous on this question. They have had no trouble distinguishing lost mile drivers, that is people who are doing the last leg. You know, goods are ordered from another state and people who are doing the last leg of that journey to get the goods from one state to another. Oh, okay. So I produce these goods in one state. I sell them to someone else, title passes, then that company ships them to the grocery store and that's the end of it. The shipment from the person to whom I sold the goods to the grocery store, that person is not engaged in their estate, almost. I think it might depend. And again, what we're asking about here is not whether lost mile drivers, however defined, are a class of workers that are exempt. What we're talking about now is how do you know whether someone is in that class? How do you know what is an independent journey from an interstate journey? And I think on your hypothetical, as I understand it, you have a manufacturer shipping goods to either a distributor or retailer and that's the end of that transaction. The manufacturer doesn't care what happens to those goods and what is purchased is just transportation from the manufacturer to someone else. If I understand what you're saying, and this is a clarification question, in other words, you could have manufacturer A and manufacturer A wants to get his goods all the way to the stores, the grocery stores, and then you could have manufacturer B and manufacturer B just conceives of his business in a different way and just wants to get the goods to wholesalers. And after that, what the wholesalers do, how they get the goods to grocery stores or anybody else is up to them. So then if manufacturer B just got the goods to the wholesaler, that would be it. That's exactly right. What we're looking at is what was the intent of the shipper at the time it was shipped. And so do you just look to contracts for this? Is it always going to be clear whether the manufacturer is just dealing with a wholesaler or whether the manufacturer is engaged in getting goods to retailers? How do you decide that? So I think the easiest way is the manufacturer will, or the employer will, in almost every case, I think every case, will know that. And so all you will need is a declaration that says, here's where we're shipping our goods, here's the intended final destination. In fact, Flowers here, there's no discovery, there was no mini trial, but Flowers describes its work in documents and declarations that say, our intended destination is the retail store. And you will be able to get that easily in every case, I think. Ms. Bennett, I don't know about that. So a title is a clear line, right? The title passes, boom. And you seem to be sort of endorsing that view. Once title passes, that's it. But if you look at this case, the contract's kind of muddled, right? It says title passes to Brock. So you might think, I know this isn't in the case, so we don't have to decide it. And I'm grateful for that. But it says title passes. But then Flowers also maintains lots of control over Brock and what happens in the retail. What do you do when you've got a muddled contract like that? Sure. So I don't think that title is the line. It could be evidence. If you're having trouble figuring out where the end of the journey is, it could be some evidence. But, again, I don't think it is usually going to matter. But there's two parts of that. So, one, does title matter? And I think the answer to that is no. Title doesn't matter at all? It will matter as evidence of what the end of the journey is. But the fact that title passes is not dispositive. This court said that in the Rerich case, which was the case where Barry ---- So what's dispositive is what I'm getting at. Because often a manufacturer B, in Justice Kagan's hypothetical, will have lots of restrictions on how wholesaler C, I dare, behaves and interacts with grocery stores as representatives de facto of the manufacturer. And, you know, there are varying levels of that. There are an infinite variety. I mean, are we going to wind up in Ms. Lovett's world where everything is relevant, nothing is dispositive? I don't think so. Because the only, you know, the thing that is relevant is the intended final destination. So long as the parties say, I intend it to end here, period, is that dispositive? I think unless you think what's happening is obfuscation. So there are, you know ---- Well, it's a contract. It's a contract. Now, are you going to say it's a contract of adhesion and, you know, I had to sign it? And, you know, public policy? I mean, where are we going to go with this? How far down the rabbit hole are you going to take us, Ms. Bennett? I don't think very far at all. I don't think you need to get in the rabbit hole. And here's why. You know, look, you could take this case, right? Don't take this case. Help me with the precedence from 1925 of which you are so knowledgeable. Because this is what the understanding of the Commerce Clause meant a long time ago. Yes. Pre-Wickard. Yes. And there have to be cases deciding all these questions. And what's the rule that you're going to advocate for? That's right. So the rule I would advocate for is intended final destination. And I hear you saying that sometimes that might have a line drawing problem. Usually it doesn't, you know, because shippers know where they sent their goods. And if you say file a declaration under oath to where you intended these goods to go, unless they're lying under oath, that will ---- How do the cases handle this? So the ---- It's a complicated question, the rabbit hole questions. So I'm happy to give you, you know, sort of where the lines were. And they're the same lines that the lower courts have had no trouble adopting here. There are really, I think, three categories of cases that were hard potentially in 1925 and because they're solved in 1925 are not hard here. So one is the question of, I think Justice Alito was asking, how do you distinguish between the first sale or transaction from, say, you know, the manufacturer out of state or the wholesaler to the retailer? And then is the retailer to the consumer a separate journey? And that, the Weigel case answers that in 1925, separate journey. So that's established. Courts have all agreed on that. The second kind of case is the case where manufacturers are sending their goods. They're essentially pre-shipping their goods and sending them to a place where they know a customer is going to order them, but the customer hasn't yet ordered them. The customer orders it either along the way or sometime very quickly thereafter. You can think of part of Amazon's business like that. That seems like it should be a genuinely hard question, except that's exactly how the livestock industry worked in 1925. And so if you look at cases like Schecter, like Stafford v. Wallace, those questions, and the third case, there's a set of three cases. One is Stafford v. Wallace, one is Schecter, and one is Swift versus the United States. And those cases dealt with exactly this anticipatory shipping question and answered that. And that's why, again, the lower courts are all in agreement about how that case comes out because they apply that rule. I find your argument extremely confusing. Maybe that is inherent in the pre-1925 case law. I would think that anybody who produces consumer goods intends for the final destination of those goods to be with the consumer because unless the consumer pays for the goods, then the producer of the goods isn't going to make any money. So I don't understand what it means to ask, what is the intended endpoint of the distribution chain? So let me try to clarify that. The question that was asked in 1925 and that we would say should be asked here is not the final endpoint of the distribution chain. It's the final endpoint of what? Of the journey when you shipped the goods. So the goods here, you take a case, you ship through UPS. Most of this kind of commerce happens through something like UPS, FedEx. You ship through UPS. Where are you trying to get those goods to go to when you ship them? Not where are they then going to subsequently go after that. So here, when Flowers ships its goods, where it's trying to get them to go is the retail stores. That's the end of that journey. There may be a separate journey if someone buys that right now. Why do you say Flowers intends the retail stores to be the end of the journey? Because that is how Flowers describes what is happening here. Flowers in the record has said the destination, again, this is a Court of Appeal Joint Appendix at 272, the destination is the retail stores, and distribution depots are just a temporary pause. And if Brock doesn't deliver to the retail stores, he's fired. Suppose Flowers had said, I intend for my bread to make it to consumers. This would be a different case? I think if Flowers ships its bread to consumers, if consumers ordered from Flowers, that would be a different case. And maybe I can explain it. Let me try a different way, which is to say, in 1925, the easy cases were cases where somebody orders it from one state, orders something from another state. That journey is from shipment in the other state to the person or business who ordered it. And that is what is going on here. The retail stores order goods, and Flowers ships them from another state. That is engaged in interstate commerce in 1925, and there's a host of cases, most of which don't involve interacting with a vehicle at all. I'll give you some examples. The Rierich case, for example, is a case of brooms that were manufactured in one state, ordered by customers from another, and workers exactly like those here. I can read the cases, and I appreciate your descriptions of them. So is what you're saying that the Federal Arbitration Act incorporates the 1925 understanding of the limits of the Interstate Commerce Clause, and so we have to go back and try to sort out what that meant? That was a body of case law with a lot of arbitrary lines. That's what you want us to do? No, Your Honor. Follow what the lower courts at that time thought about the limits of Congress's power to regulate interstate commerce? No, Your Honor, and I want to be really clear about this. This case has nothing to do with what the limits of the Commerce Clause were in 1925. What we're asking this court to do is look at what the meaning of the words interstate commerce meant in 1925, and then what it meant to be engaged in interstate commerce, and whether you look at cases under any body of law. If you look at cases under the Commerce Clause, if you look at cases under FILA, if you look at cases under the Interstate Commerce Act, under the Motor Carrier Act, which was passed a little bit later, those cases are not defining. The utility of those cases is that they're showing what it meant to be engaged in interstate commerce. And those courts were not trying to understand. They were not basing their understanding of the meaning of interstate commerce on the meaning of interstate commerce under the Commerce Clause. This was independent of that? I think the scope of the Commerce Clause is about not what the meaning of interstate commerce is. It's about what relationship to interstate commerce and activity has to have to be regulable. So under any doctrine, the meaning of the words interstate commerce was the same, and the question under various cases, under various statutes and under the Commerce Clause is, is this activity, have the relationship required either by the Commerce Clause or various statutes to interstate commerce to count? And that's not before us, right? No. So can I focus us on what is before us? Sure. I think I'm just trying to really get back to the issue of the day. As I understand your argument, you are starting, or we are all starting, from the position of taking for the purpose of today that both sides agree that the retail stores were the end of the journey at issue. That's right. Right. So no dispute on that for the purpose. I know they're going to argue about it later, but right now everybody says, okay, retail stores are the end. And we know that Mr. Brock drives these goods to the retail stores intrastate. He gets the goods in the state and he gets them to the retail store. That is the end of this interstate journey that the goods have been on. That's right. All right. So the only question before us right now is how do we characterize Mr. Brock, his role, his work in that particular journey or set of circumstances? Your friend on the other side, Ms. Lovett, says we have to look at the class of cross-border workers, that the only way that Mr. Brock gets to have this exemption is that if we can say that he is a cross-border worker, I think she has that terminology. The worker at each leg or at his leg has to be engaged in cross-border transportation work. Now, we know that we've already said he himself doesn't have to cross the border. So she says how you make that determination about cross-border transportation work is whether he engages in vehicles that have crossed the border. What is your response to why she's wrong about the extent to which he would have to engage? First of all, is she right that we should be looking at whether he is engaged in, quote, cross-border transportation work? And if so, is she right that the way to do that is to focus on his engagement with the vehicle? Sure. So in 1925, the ordinary meaning of the words engaged in interstate commerce, and I took flowers to agree with this in their opening brief but maybe has backed away from it, is a worker who is engaged in interstate transportation or work that is so closely related to that to be practically a part of it. So what we're looking at, this Mr. Brock and drivers like him are engaged in interstate transportation. That's the question. And so the question is, and to be engaged in interstate transportation in 1925, you do not have to interact with a vehicle. And with apologies to Justice Alito, I'll just give you a few examples. There's a rare case, which I mentioned, that's workers exactly like this held to be engaged in interstate commerce. There's a case called Seaboard Airline Railroad versus Moore, which is in our brief. There the worker is a railroad worker who is held to be, quote, actually engaged in interstate commerce even though his work didn't take him out of Florida. And the reason for that is because he transported a train that had lumber, and that lumber was then unloaded and put on a boat to a different state. So again, exactly. So it was the goods that was due. Exactly. I mean, I think that's the key question.  Do you get it because you are working or engaging with goods that have been in interstate commerce or not? That's right. That's exactly right. You know, Hancock, the question they said, a worker is employed in interstate commerce if any of the cars in his train contained interstate freight. So it's keyed to the freight. And the cars was actually a harder question in 1925. You could, of course, some workers were either engaged in interstate transportation or worked so closely related to it because they interacted with the instrumentalities of commerce. That was a hard question in 1925. I was just saying, and in Hancock, I mean, it doesn't seem to me that you get clearer than the statement, quote, the determining circumstance is that the shipment was but a step in the transportation of the coal to real and ultimate destinations in another state. So it was the coal that was moving in interstate commerce that became the, quote, unquote, determining circumstance in Hancock. Is that right? That's exactly right. And the Zachary case that they mentioned, what the court said is because the cars crossed state lines, there's a reasonable inference that the freight did, and that would make the worker engaged in interstate commerce. So the oranges were delivered by the Uber Eats guy in Colorado. So then he's, I think he's just shifted to the goods. So I want to be clear. The question isn't whether the goods have been transported in interstate commerce. So your question is, once it gets to the retail store, is the next leg still in interstate commerce? I'll flag that that's a different question than the question here, which is, are the goods in interstate commerce for the journey to the retail store? So that there's a separate journey for the Instacart driver and the oranges. The question there is, are those oranges still in interstate commerce? I think the answer to that is no. Again, that's the Weigel case. And it's, you know, when goods were ordered, if you look at the Lipscomb case, if you look at the Rerich case, the Seaboard case, when goods are ordered from one state, or from another state, the interstate journey is from the manufacturing plant or whoever is selling those goods to the person or company who ordered them. That's the journey. When an ultimate consumer does the ordering. I mean, suppose that I get on the Internet and I click into some cosmetics company. And so I'm getting these cosmetics from the cosmetics company. Then it's everything that happens from where the cosmetics company is making the product to the ultimate consumer, isn't it? Right, because if you look at who ordered the goods and the shipment from whoever's selling or manufacturing the goods to who ordered them, that's a journey. And does it matter if when I order those goods from the cosmetics company, the cosmetics company actually has a way of, like, signaling some wholesaler or signaling even a retail store, you know, get the cosmetics to Ms. Kagan? I don't think so. But, again, to answer that question, what I would do is say, would that have counted as interstate transportation in 1925? And I would look at the livestock cases, actually, that I was mentioning to Justice Gorsuch to figure that out because this wasn't an uncommon situation then. Thank you, Counsel. If you have a big wholesaler, right, and you know that I understand your argument there, and you say, well, between the wholesaler and the consumer, no, right? Well, the way business is these days in product and consumer products, they're often big wholesalers and then little wholesalers. And so, I mean, you can chop this up as many ways as you want. What is it between the big wholesaler in, you know, Chicago and the little wholesaler in a little town outside of Chicago? I mean, it doesn't always go from this big wholesaling to the individual home. So where do you stop? What's your choice between those two? Big wholesaler to little wholesaler, little wholesaler to home, you're saying, I guess, that doesn't count. But what about the link between the two different types of wholesalers? If I understand correctly, you're saying somebody in, you know, a wholesaler orders goods from a bigger wholesaler in the state. I think when those goods are shipped to the person who ordered them, that journey is over. And then you look to the – there may be a subsequent journey after that that's independent, that may or may not be interstate. But when goods are shipped to the person or company that ordered them, that's the journey. Even if it's not – even if they've already stopped at a wholesale facility apart from the truck? I'm not understanding you. Here's the – the truck goes to the wholesaler, right? And the wholesaler, instead of going right to the consumer, goes to another wholesale facility, which happens a lot.  I think if – but if what's happening is the consumer is ordering a good from out of state and the – what's happening when the out-of-state company ships the good, that journey is in interstate commerce from the time it leaves the manufacturing or first wholesaler until it gets to the consumer. Because that was well-established in 1925. If you look at Lipscomb or Rierich, what you'll see is the interstate journey is from order to place that is selling or manufacturing it. Well, I don't know if they had the sophisticated and multivariated distribution system we have today in 1925. That is, I think, a little bit less, but you'd be surprised. So, again, these lifestyle cases had these kinds of complicated arrangements. But they often boil down to fundamental principles, which is, what did the parties to the commerce intend this shipment to be? When you ship this good, where was it going? And if somebody orders a good that gets shipped to them from out of state, that's a journey. And whatever happened after that is an independent journey. But that's where I would put the beginning and end. Whatever happens... I'm sorry. Justice Thomas? If Flowers was simply shipped to a final destination at a distribution center and relinquished title to your client, would that change your argument? I think if the commerce was truly between Flowers and Mr. Brock, that would be a different case. Mr. Brock would then essentially be a retailer like Walmart or Sam's Club, but... Justice Alito? Justice O'Neill? The cases you're relying on are all Supreme Court cases, correct? Correct. So they're not lower court cases. They're what the cases defined as interstate commerce and workers involved in interstate commerce, correct? Correct. For purposes of feel in many examples, but it was what engaged in commerce meant at the time. That's exactly right. And that's what this court... You have cases from 1925. You have this court's decision in Morris v. McComb, which says that drivers are engaged in interstate commerce when they do this kind of last mile journeys. There are a number of precedents from this court that this court, I think, would have to overrule to say that last mile drivers or interstate-leg drivers are not engaged in interstate commerce, or the court would have to say the FAA means something different with those words than it has meant those words have ever meant. And Justice Gorsuch has put a question to your adversary about what... Opposing counsel. I shouldn't use the word adversary. Opposing counsel. About how to define the question presented. Answer the question he posed. It would be no. It doesn't matter whether... I would say the answer, I think, to the question presented is posed, which I take to be, are workers who don't physically cross state lines and don't interact with a vehicle engaged in interstate commerce or exempt from the FAA? I would say it depends on what class of workers they are a member of and what the work of that class is. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? Two questions. One, you said, in response to Justice Barrett, last mile drivers doesn't need to be the term. I wasn't clear on what the exact phrase you would use as a substitute for the term. I understood the question to be, could we define the class as people who perform an intrastate leg of an interstate journey? And you're good with that phrasing right there? Absolutely, yeah. Okay. And then, in response to Justice Gorsuch, I think you were going through, very helpfully, categories of cases, and you got through one and two, which I'm not sure you got through the third, but maybe you covered it in later questions. I just want to make sure I'm not missing that third category. Sure. So I think there are three, and I think the ones I got through were anticipatory shipping. So what do you do when the order is anticipated but not actually offered? Got that one. I think the second one, I actually don't remember what the second one was that I answered to you, so I'm not sure what two and three are, but the second one, I think, was the retail stores, also clear line in 1925. And that's, again, it follows from the order. And then the third one is this obfuscation question, where a company was trying to obfuscate exactly what commerce is happening or where the journey begins and ends. That was very common in 1925, where companies would try to get out of, say, the Interstate Commerce Act or FILA by obfuscating where the beginning and end of the journey is. And there are lots of cases about that in 1925 that says you can't convert an interstate shipment into intrastate transportation just by dividing up the legs. You can look at the Bear Brothers case. You can look at the Southern Pacific Terminal case. You can look at the Sabine Tram case. And that's how those courts analyzed it. But what we're going to do is we're going to look at where were the goods ordered and where were they ordered from. Thank you. Justice Barrett. To be sure I understand your position, you've been asked a lot of questions about the line drawing in your position because it does involve some complicated lines. You said, I think in response to Justice Sotomayor, that the answer to the QP technically, in your view, would be it depends. It seems to me that the further question of depends on what is pretty complicated. How do you figure out intent? Are we looking at when title passes? Are we looking at some sort of declaration? Are we looking at who gets the profit? We can start to see why the 10th Circuit's opinion was quite complicated, right? But I think those are questions for another day. Is that your position? Like just answer it depends. There's no automatic rule of exclusion. But what it depends on can be very complicated. And it may not always be the case that these 1925 cases you're pointing to answer the question in the modern complicated world with different kinds of distribution change. Livestock, maybe there's some good analogies to be drawn between livestock and, you know, computer equipment. But those are pretty complicated questions and I think Ms. Leavitt correctly points out that there would be very difficult line drawing questions. That even if your position is right, that courts would have to face. So we could say it depends and not depends on what. Yes, although I want to be clear. I think in most cases there will not be complicated line drawing questions and you see this because, you know, most of the cases Flower cites for their complicated line drawing questions are cases where the district courts easily granted a motion to compel arbitration and had almost nothing to do with last mile drivers. And the other categories of cases are ride share cases, which on our view, that case comes to the court once and what you would look at, I think the difficulty with ride share drivers is that some of them cross state lines. They're in Kansas City or D.C. And in our view, the question there would be in 1925 where workers who were performing what is fundamentally local transportation but sometimes cross state lines, were they engaged in interstate commerce? Horses and buggies cross state lines. But we don't have to answer those questions. Correct. You don't have to answer any of these questions. The only thing this court has to say to answer the question presented is there is no absolute requirement that you physically cross a state line or interact with a vehicle that does whatever it might mean to interact with a vehicle. Justice Jackson? One final quick thing. You say or you set this all up to have the analysis turning on the intended destination of the goods or the freight as the parties agreed. Ms. Lovett has it turning on loading and unloading. There was a key part of her analysis that was about loading and unloading. In 1925, is there any evidence that that was a factor in how we're supposed to be thinking about this? So the yes and no, which is to say I think in 1925, the interstate transportation ended when the goods were unloaded at their final destination. I see. So I think it's clear that anything that happens once you get to the destination and unload the goods, that's out. But it wasn't whether the goods were loaded and unloaded at intermediate points. The RERA case loaded and unloaded. The Seaboard Airline case, that's lumber. So that's not a factor, you think, in isolating or answering this question? No, I don't think that's a factor. It does help make clear about why some of the hypotheticals posed about what's going to happen afterwards are not implicated by this case. A retail clerk that handles goods after they've been unloaded at the final destination, that commerce has ended, but it doesn't answer the intermediate question. Thank you. Thank you, Counsel. Rebuttal, Ms. Lovett? Thank you, Mr. Chief Justice. Section 1 asks a fundamentally different question than the Commerce Clause was asking in 1925. It's asking whether or not the transportation worker is engaged in cross-border transportation work. That's what this Court held in Saxon and Bissonnette. It's different from the Commerce Clause analysis because of the words engaged in, which this Court has twice held are narrower than the scope of the Commerce Clause and are intended to limit to something much more direct and active in the movement of goods across borders. So to answer the question, you shouldn't be looking to Commerce Clause cases. Those are going far too broadly. The key cases in this context are Saxon and Bissonnette, and they explain the question is, what is the work the worker is performing? Ms. Saxon's work, the task that she was performing, was loading and unloading goods onto vehicles that were traveling to different states. It is the transportation work that matters, not the destination of the good. So you've heard a lot in the last 35 minutes. You've heard a lot about parties and tents. You've heard about, well, you have to know where the profit turns. You have to know where things are preordered. You have to know whether you're manufacturer A or manufacturer B, all of which Bissonnette says shouldn't matter because that's about the business that the manufacturer is in, not the business of what the worker is doing. What you didn't hear about was any defense of the four circuit court decisions that have adopted Brock's approach, not in the briefing and not here today. That's because all you have to do is read those four cases and see how quickly this analysis spins out of control, or read Judge Bress's dissent in Ripman, the first case that adopted this approach. He predicted that exactly this would occur because in 1925, the lines weren't bright. They weren't clear. They were so muddled that people were asking questions about whether brooms were in the same package that they were or whether they'd been disentangled. That is not the kind of bright line rule that a threshold requirement like Section 1 should have. Clarity is needed for rules that establish the threshold, particularly under the FAA, the whole point of which is to avoid litigation, to have speed and efficiency in resolving conflicts. This is now adding a whole separate layer. Brock's approach is adding a whole separate layer of litigation over intent. There is no more fact-bound question in the law than what are the parties' intent. And you've heard that today because you can't answer it without it depends. And Section 1 is begging for an answer other than it depends. And that answer is directly from the text of Section 1. It's not an ambiguous rule. It's not a made-up rule. Section 1 is saying you have to be engaged in cross-border movement, cross-border transportation, and we know that from Saxon and Bissonnette. I think the lower courts are showing what happens when you adopt this rule. For 100 years, this court has lived with the FAA Section 1, and there has not been any lack of clarity because the industry understands what it means to be a transportation worker. You move a good across the border, you load it, you unload it. That's where transportation begins and ends. That rule has been clear since 1925 because this court in Saxon cited the cases showing that that's how transportation worked, not interstate commerce, but transportation work was judged in 1925 from the point of loading and unloading. The question of final destination is a question of interstate commerce under the Commerce Clause, and the Commerce Clause, despite what counsel says and none of the cases that she's citing under the Commerce Clause, defined the terms engaged in. You can read the Commerce Clause for a long time, and you won't find those terms within the Commerce Clause. You will find them in Section 1, and it's engaged in interstate commerce that's used in conjunction with ajustum, that tells you that the commerce that the workers have to be engaged in isn't a transaction in interstate commerce. It's transportation that crosses the border. In our view, this is a clear case, and Section 1 demands a clear rule. The clearer a rule, the narrower the disputes, and that's what Section 1 demands. Thank you, counsel. The case is submitted.